# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| CORTEZ CRAWFORD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. |
| vs. | ) |
| | ) |
| BLOX, LLC, | ) |
| | |
| Defendant. | |

## COMPLAINT

### I. JURISDICTION

1. This is a suit for relief from race discrimination and retaliation instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* ("Title VII"), and 42 U.S.C. §1981 ("§1981"). The jurisdiction of this Court is based on 28 U.S.C. §§1331 and 1343(4).

2. Plaintiff Cortez Crawford ("Plaintiff") timely filed his charge of discrimination against defendant Blox, LLC ("Defendant") with the Equal Employment Opportunity Commission within 180 days after the last act of discriminatory treatment. Plaintiff has further filed this complaint within 90 days after receipt of his right-to-sue letter.

## II. PARTIES

3. Plaintiff is a United States citizen over the age of nineteen and a resident of Birmingham, Alabama.

4. Defendant is a limited liability corporation located in Bessemer, Jefferson County, Alabama and an employer as that term is contemplated under Title VII.

## III. FACTS

5. Plaintiff is African-American.

6. In or about June of 2015, Plaintiff became employed by Defendant at its Bessemer, Alabama plant.

7. Plaintiff was hired in as a general laborer and worked in a production position at the "cut station."

**Disparate Pay**

8. In or about February of 2016, Defendant hired Angel "Casey" Calkins.

9. Calkins is Caucasian.

10. Calkins was hired in as a general laborer and worked with Plaintiff at the cut station.

11. Calkins was hired in making $4 an hour more than Plaintiff's starting rate and $2 more per hour than Plaintiff was making at the time of Calkin's hire.

12. Plaintiff went to his supervisor, Wes Brakefield, about the pay discrepancy.

13. Brakefield is Caucasian.

14. Plaintiff asked Brakefield how they could bring someone in with no experience and pay them more than Plaintiff after he had been there seven months.

15. Plaintiff further asked Brakefield if it was because of the color of his skin.

16. Brakefield said that was not it and that he would look into it.

17. Brakefield later came to Plaintiff and told him that they were raising his pay $4 an hour.

18. However, Plaintiff never got the raise.

19. In late April or early May, Plaintiff went to Anna Giattina Lee, the sister of Defendant's Chief Executive Officer.

20. Lee is Caucasian.

21. Lee was new there and Plaintiff understood that she worked in some sort of human resources position.

22. Plaintiff told Lee about the pay situation.

23. Lee said that she had been an attorney for many years and that it didn't sound like discrimination to her.

24. Lee said she would talk to Brakefield and Laura Donald, Defendant's Chief Operating Officer, about it.

25. Donald is Caucasian.

26. Plaintiff never heard back from Lee or anyone else about the raise.

27. Calkins later told Plaintiff he had gotten a $1 an hour raise, which would have been $3 more per hour than Plaintiff.

**Racial Harassment**

28. From about the second week after he became employed with Defendant, Plaintiff was subjected to racial harassment in the workplace on a regular basis.

29. Plaintiff was referred to by the "n-word" or it was said in his presence 3-4 times a week.

30. Plaintiff complained to supervisor Brakefield numerous times about it.

31. At first Brakefield would ignore Plaintiff, then he started telling Plaintiff he was tired of hearing him complain about it.

32. Occasionally, Brakefield would say something to the person who had made the racist remark and tell them to stop calling Plaintiff that because Plaintiff was "bitching" about it.

33. The Caucasian employees would then make jokes about Plaintiff "bitching."

34. The racial remarks did not slow down.

35. The plant was growing rapidly, and as more Caucasian employees came in, they heard the racial remarks and came to see how it was tolerated there.

36. So, some of the Caucasian new hires started doing it.

37. It was done not just to Plaintiff but to other African-American employees.

38. Plaintiff personally saw at least 25-30 occasions where a Caucasian employee and an African-American employee almost came to blows because of the racial remarks if people hadn't separated them.

39. Calvin Kuykendall is Caucasian and was the Plant Manager until November of 2015.

40. Plaintiff reported racial remarks to him on one occasion, and he fired the employee who said them.

41. However, Kuykendall left not long after this happened and the racial remarks did not slow down.

42. Plaintiff tried to talk to COO Donald about the racial remarks several times.

43. Plaintiff approached Donald several times and asked if he could talk to her, but she always walked right past him without saying anything.

44. Plaintiff saw Donald at her car in the parking lot one day and asked her if he could talk to her.

45. Donald said she was busy and walked by Plaintiff.

46. Plaintiff also went to Donald's office a few times.

47. Marcus Campbell, a Caucasian Production Supervisor, was there and told Plaintiff that he could not go in Donald's office.

48. Late in 2015, Adam Russell called Plaintiff the n-word.

49. Russell, an electricians' supervisor, is Caucasian.

50. Plaintiff had borrowed a drill from an electrician.

51. Russell was the electrician's supervisor, and he asked the electrician why he wasn't working.

52. The electrician said that he was waiting on Plaintiff to bring his drill back.

53. Russell came over to Plaintiff, picked up the drill, and loudly called Plaintiff a thief.

54. Plaintiff asked Russell who the hell he thought he was talking to.

55. Russell said loudly, "Nigger, let's go to the office."

56. Russell then said it again.

57. Plaintiff went to the office, but there was a meeting going there.

58. Plaintiff was told to go to the break room.

59. Plaintiff went to the break room, and Russell was there with Campbell, the production supervisor who had told Plaintiff he could not go into COO Donald's office.

60. Campbell was seated at a table and Russell was standing.

61. Plaintiff sat down at the table with Campbell.

62. Campbell asked Russell how he could call Plaintiff the n-word.

63. Russell walked up to Plaintiff and shoved him on his shoulder.

64. Russell asked Plaintiff if he wanted to go outside.

65. Plaintiff followed Russell outside.

66. Campbell followed them and told Plaintiff to stay outside.

67. Campbell took Russell back inside.

68. Shortly after that, Plaintiff saw Russell driving out of the parking lot.

69. Campbell came back and told Plaintiff that he had suspended Russell for a week.

70. However, Plaintiff found out that Russell was actually on paid vacation.

71. Defendant does not allow employees to use vacation days for suspensions.

72. Early in 2016, Chris Giattina, Defendant's Chief Executive Office, spoke to all employees who started at 7:30 a.m.[1]

73. Giattina is Caucasian.

74. Giattina said he had heard that the n-word was "freely" being used in the workplace, that it was not tolerated, and that it had to stop.

75. However, nothing else was done and the racial remarks did not slow down at all.

**Termination**

76. On or about July 15, 2016, Plaintiff went to what is called the "cool room" in the warehouse when his morning break started.

77. Plaintiff went in there to get some Gatorade that was kept there.

78. There were some other employees in the cool room at the time, about six Caucasian and three African-American.

79. Plaintiff finished his drink and was about to go to his car for the rest of the break.

80. At that point, Steve Krubinski, Plant Controller, came in the room.

81. Krubinski is Caucasian.

---

[1] Half the production employees started at 7:30 a.m., and the other half started at 8:00 a.m.

82. Krubinski looked at Plaintiff and yelled, "What the hell are you doing in here?"

83. Plaintiff told Krubinski that he was on break getting a drink.

84. Krubinski told Plaintiff that he wasn't going to get a drink in there and to go to the break room.

85. Plaintiff told Krubinski that he was going to his car.

86. Plaintiff walked past Krubinski, and as he did he heard Krubinski softly say "nigger."

87. Plaintiff turned around and asked Krubinski to repeat what he had just said.

88. Krubinski then loudly said, "nigger."

89. Plaintiff left and went out to his car.

90. Plaintiff then contacted Keith Horowitz, the Plant Manager who had replaced Kuykendall.

91. Horowitz is Caucasian.

92. Plaintiff told Horowitz what had happened with Krubinski.

93. Horowitz asked Plaintiff who was there and Plaintiff told him.

94. Horowitz told Plaintiff to go home for the day.

95. Plaintiff did as he was told.

96.  On the following Monday, July 18, Plaintiff called in sick.

97.  That Tuesday, July 19, Plaintiff went in to work.

98.  A couple of hours after Plaintiff started, Horowitz called Plaintiff to the office.

99.  Horowitz told Plaintiff that they had to let him go because they felt that he had provoked Krubinski into calling him the n-word.

100.  Nothing was done to Krubinski.

## IV.  CAUSES OF ACTION

### COUNT I

### DISPARATE PAY - TITLE VII

101.  Paragraphs 1-27 above are incorporated by reference.

102.  Defendant violated Plaintiff's rights under Title VII by discriminating against him because of his race in paying him less than a similarly situated Caucasian employee.

103.  As a result of the above described discriminatory acts, Plaintiff has been made to suffer lost wages, as well as emotional distress and mental anguish.

**WHEREFORE, these premises considered**, Plaintiff respectfully requests the following:

(i)  That the Court issue an Order declaring that Defendant's acts as described herein violated Title VII;

(ii)  That the Court enter an Order requiring Defendant to make Plaintiff whole by providing back-pay with interest, and ordering Defendant to pay compensatory and punitive damages as a jury may assess;

(iii)  That the Court grant Plaintiff a permanent injunction enjoining Defendant, and its agents, employees, successors, and those acting in concert with Defendant from further violation of Plaintiff's rights under Title VII;

(iv)  That the Court award Plaintiff prejudgment and post-judgment interest at the highest rates allowed by law and an amount to compensate him for any adverse tax consequences as a result of a judgment in his favor; and

(v)  That the Court award such other legal and equitable relief as justice requires, including, but not limited to, an award of costs, attorney's fees, expert witness fees, and expenses.

## COUNT II

### DISPARATE PAY - 42 U.S.C. §1981

104.  Paragraphs 1-27 above are incorporated by reference.

105. Defendant violated Plaintiff's rights under §1981 by discriminating against him because of his race in paying him less than a similarly situated Caucasian employee.

106. As a result of the above described discriminatory acts, Plaintiff has been made to suffer lost wages, as well as emotional distress and mental anguish.

**WHEREFORE, these premises considered**, Plaintiff requests the following:

(i) That the Court enter an Order declaring that Defendant's acts as described herein violated 42 U.S.C. §1981;

(ii) That the Court enter an Order requiring Defendant to make Plaintiff whole by providing back-pay with interest, and ordering Defendant to pay compensatory and punitive damages as a jury may assess;

(iii) That the Court grant Plaintiff a permanent injunction enjoining Defendant, and its agents, employees, successors, and those acting in concert with Defendant from further violation of Plaintiff's rights under §1981;

(iv) That the Court award Plaintiff prejudgment and post-judgment interest at the highest rates allowed by law and an amount to compensate him for any adverse tax consequences as a result of a judgment in his favor; and

(v)  That the Court award such other legal and equitable relief as justice requires, including, but not limited to, an award of costs, attorney's fees, expert witness fees, and expenses.

## COUNT III

## RACIAL HARASSMENT - TITLE VII

107.  Paragraphs 1-100 above are incorporated by reference.

108.  Defendant violated Plaintiff's rights under Title VII by subjecting him to racial harassment that constituted a hostile environment and/or culminated in an adverse employment action.

109.  As a result of the above described discriminatory acts, Plaintiff has been made to suffer emotional distress and mental anguish.

**WHEREFORE, these premises considered**, Plaintiff respectfully requests the following:

(i) That the Court issue an Order declaring that Defendant's acts as described herein violated Title VII;

(ii) That the Court enter an Order requiring Defendant to make Plaintiff whole by ordering Defendant to pay compensatory and punitive damages as a jury may assess;

(iii) That the Court grant Plaintiff a permanent injunction enjoining Defendant, and its agents, employees, successors, and those acting in concert with Defendant from further violation of Plaintiff's rights under Title VII;

(iv) That the Court award Plaintiff prejudgment and post-judgment interest at the highest rates allowed by law and an amount to compensate him for any adverse tax consequences as a result of a judgment in his favor; and

(v) That the Court award such other legal and equitable relief as justice requires, including, but not limited to, an award of costs, attorney's fees, expert witness fees, and expenses.

## COUNT IV

### RACIAL HARASSMENT - 42 U.S.C. §1981

110. Paragraphs 1-100 above are incorporated by reference.

111. Defendant violated Plaintiff's rights under §1981 by subjecting him to racial harassment that constituted a hostile environment and/or culminated in an adverse employment action.

112. As a result of the above described discriminatory acts, Plaintiff has been made to suffer emotional distress and mental anguish.

**WHEREFORE, these premises considered**, Plaintiff requests the following:

(i)  That the Court enter an Order declaring that Defendant's acts as described herein violated 42 U.S.C. §1981;

(ii)  That the Court enter an Order requiring Defendant to make Plaintiff whole by ordering Defendant to pay compensatory and punitive damages as a jury may assess;

(iii)  That the Court grant Plaintiff a permanent injunction enjoining Defendant, and its agents, employees, successors, and those acting in concert with Defendant from further violation of Plaintiff's rights under §1981;

(iv)  That the Court award Plaintiff prejudgment and post-judgment interest at the highest rates allowed by law and an amount to compensate him for any adverse tax consequences as a result of a judgment in his favor; and

(v)  That the Court award such other legal and equitable relief as justice requires, including, but not limited to, an award of costs, attorney's fees, expert witness fees, and expenses.

## COUNT V

## TERMINATION - TITLE VII

113.  Paragraphs 1-100 above are incorporated by reference.

114.  Defendant violated Plaintiff's rights under Title VII by terminating his employment because of (a) his race and/or (b) he had complained of what he reasonably believed to be unlawful racial discrimination in employment.

115.  As a result of the above described discriminatory act, Plaintiff has been made to suffer lost wages and benefits, as well as emotional distress and mental anguish.

**WHEREFORE, these premises considered**, Plaintiff respectfully requests the following:

(i)  That the Court issue an Order declaring that Defendant's acts as described herein violated Title VII;

(ii)  That the Court enter an Order requiring Defendant to make Plaintiff whole by reinstating him and placing him in the position he would have occupied in the absence of discrimination (or, alternatively, providing front-pay), providing back-pay with interest, and ordering Defendant to pay compensatory and punitive damages as a jury may assess;

(iii)  That the Court grant Plaintiff a permanent injunction enjoining Defendant, and its agents, employees, successors, and those acting in concert with Defendant from further violation of Plaintiff's rights under Title VII;

(iv) That the Court award Plaintiff prejudgment and post-judgment interest at the highest rates allowed by law and an amount to compensate him for any adverse tax consequences as a result of a judgment in his favor; and

(v)  That the Court award such other legal and equitable relief as justice requires, including, but not limited to, an award of costs, attorney's fees, expert witness fees, and expenses.

## COUNT VI

## TERMINATION - 42 U.S.C. §1981

116.  Paragraphs 1-100 above are incorporated by reference.

117.  Defendant violated Plaintiff's rights under §1981 by terminating his employment because of (a) his race and/or (b) he had complained of what he reasonably believed to be unlawful racial discrimination in employment.

118.  As a result of the above described discriminatory acts, Plaintiff has been made to suffer lost wages and benefits, as well as emotional distress and mental anguish.

**WHEREFORE, these premises considered**, Plaintiff requests the following:

(i) That the Court enter an Order declaring that Defendant's acts as described herein violated 42 U.S.C. §1981;

(ii) That the Court enter an Order requiring Defendant to make Plaintiff whole by rehiring him and placing him in the position he would have occupied in the absence of discrimination (or, alternatively, providing front-pay), providing back-pay with interest, and ordering Defendant to pay compensatory and punitive damages as a jury may assess;

(iii) That the Court grant Plaintiff a permanent injunction enjoining Defendant, and its agents, employees, successors, and those acting in concert with Defendant from further violation of Plaintiff's rights under §1981;

(iv) That the Court award Plaintiff prejudgment and post-judgment interest at the highest rates allowed by law and an amount to compensate him for any adverse tax consequences as a result of a judgment in his favor; and

(v) That the Court award such other legal and equitable relief as justice requires, including, but not limited to, an award of costs, attorney's fees, expert witness fees, and expenses.

        Respectfully submitted,

        s/ Adam M. Porter
        Adam M. Porter
        Attorney for Plaintiff
        Alabama Bar ID: ASB-2472-P75A
        ADAM M. PORTER, LLC
        2301 Morris Avenue, Suite 102
        Birmingham, Alabama 35203
        Phone: (205) 322-8999
        Facsimile: (205) 402-4619
        Email: adamporter@earthlink.net

Plaintiff requests trial by struck jury.

        s/ Adam M. Porter
        Attorney for Plaintiff

Defendant's Address:
Blox, LLC
c/o Christopher A. Giattina, Registered Agent
2625 5th Ave N., Bldg. C
Bessemer, AL 35020